**HOMEMAKERS NORTH SHORE, INC.,**
**Plaintiff-Appellant,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant-Appellee.**

No. 87–1389.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1987.

Decided Oct. 22, 1987.

Sanford V. Teplitzky, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for plaintiff-appellant.

Richard A. Urbin, Asst. Regional Counsel, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Providers of medical services under the Medicare program, 42 U.S.C. § 1395, et seq., usually receive reimbursement for the "customary charge" for the services, not to

exceed the "reasonable cost" of providing them, as the Secretary of Health and Human Services reckons "cost", 42 U.S.C. § 1395f(b), § 1395x(v)(1)(A). Nursing services usually are reimbursed at a fixed price per service. A provider that can supply care for less makes a profit, and a provider that cannot suffers a loss.

Since 1979 the Secretary also has allowed fledgling providers of home nursing services to recover their actual costs, if reasonable, at a rate higher than the one ordinarily applicable. The regulation adopted in 1979 excepted a "newly established home health agency" from the usual limits on reimbursement, provided (among other things) the agency "has operated as the type of provider for which it was certified for Medicare ... for less than three full years." 42 C.F.R. § 405.460(f)(7) (1979). The Secretary amended this in 1984 to: "has provided ... for a period of less than three full years home health care services equivalent to those that would have been covered if the agency had a Medicare provider agreement in effect." 49 Fed.Reg. 20616, 20628 (May 15, 1984), 49 Fed.Reg. 27272, 27284–85 (July 2, 1984), 42 C.F.R. 405.460(f)(7) (1984), now codified at 42 C.F.R. § 413.30(f)(7). The principal question in this case is whether these two definitions of equivalency are equivalent to each other.

Founded in 1968, Homemakers North Shore, Inc., furnished its clients in Illinois with a variety of services, including home nursing care. Its nurses visited the homes of patients with chronic ailments. Homemakers' executives characterize the nursing as "private duty" or "custodial care" nursing, meaning that nurses served for extended periods (no less than four hours per call, and often more) but did not render care for acute conditions. By 1972 Homemakers, a subsidiary of Upjohn HealthCare Services, a large medical-service firm, had professional supervisory nurses monitoring its home services. Position descriptions for these supervisory positions in 1975 recounted that the supervisors were responsible for coordinating with physicians the health care plans to be carried out by Homemak-

ers' nurses, most of whom were licensed practical nurses.

Until 1977 neither Illinois nor the federal government regulated Homemakers' business. This absence of regulation prevented Homemakers from receiving reimbursement for its services as a "home health agency" (the appropriate category under the Medicare statute). Until 1981 the Medicare statute excluded unlicensed, proprietary firms from participation. 42 U.S.C. § 1395x(o) (1976). When Illinois adopted a licensing statute in 1977, Ill.Rev. Stat. ch. 111½ ¶ 2801 et seq., Homemakers became eligible for federal reimbursement if it could first qualify under state law. It did so, taking advantage of a "grandfather" clause in Illinois law. Its application papers represented to Illinois that it had been providing high quality home nursing care for a decade. Illinois granted Homemakers a license, and the Medicare program promptly certified Homemakers as a "home health agency", waiving the inspection and audit that are required for start-up firms.

Since joining the Medicare program Homemakers has sought exception from the usual cost ceilings, relying on § 405.-460(f). Homemakers maintained that it had not formerly furnished nursing services as the "type of provider" qualified for the Medicare program because, until it was licensed under Illinois law, it could not be a "provider" at all. In other words, Homemakers read § 405.460(f) as a term of art, under which each "home health agency" is entitled to an exception during its first three years as a qualified provider—or at least the first three years it was legally entitled to be a certified "home health agency", whether or not it choose to participate in the program for all three. Homemakers also contended that when it joined the Medicare program it altered its business, substituting registered nurses for licensed practical nurses and furnishing services at a higher level of skill; this change, it believed, entitled it to treatment as a new provider.

Employees of the Department have not been of one mind about Homemakers' posi-

tion. Homemakers was certified as a Medicare provider in August 1979, three days after it received its final state license. (It had been operating under a provisional license.) On September 10, 1979, the Director of the Division of Provider Reimbursement in the Health Care Financing Administration within the Department wrote Homemakers that "your facility is deemed to be a newly established home health agency". The Director did not give reasons. When Homemakers submitted its first requests for reimbursement, the Office of Direct Reimbursement (a component of the Administration then serving as Homemakers' "financial intermediary") rejected the claims as exceeding the per-visit limits on "reasonable cost". The Office of Direct Reimbursement continued to reject Homemakers' claims for the reporting periods through November 1981.

Homemakers appealed the denials for 1979 and 1980 to the Provider Reimbursement Review Board, still another part of the Department, see 42 U.S.C. § 1395. While the case was pending, the Health Care Financing Administration decided that Homemakers had been a "newly established" health agency since October 1, 1977, and planned to reopen the 1979 fiscal year. It chose October 1, 1977, because Illinois' licensing statute took effect that date and Homemakers became eligible for participation in the Medicare program. But Homemakers by then had appealed the denial of an exception for 1981. The Board consolidated the cases and concluded that Homemakers became a new agency on July 31, 1979, close to the time it received a final license from Illinois. This led to a grant of Homemakers' claim for all three years.

The Administration's Bureau of Eligibility, Reimbursement and Coverage, contending that Homemakers furnished home nursing—the "type" of service in question—for three years before it joined the Medicare program, and therefore is not eligible for an exception under § 405.460(f), appealed to the Secretary. The Deputy Administrator of the Health Care Financing Administration, acting as the Secretary's delegate, rendered the Department's final decision.

The Deputy Administrator adopted the Bureau's construction of the 1979 regulation. His opinion emphasized that Homemakers long had been providing home nursing services. Under the 1984 version of the regulation, the Deputy Administrator reasoned, Homemakers' application would be denied out of hand; he thought the two versions functionally identical, because in either case the Department wanted to limit exceptional compensation to new providers that were building up their referral systems and caseloads. These new firms would experience higher costs per patient for a brief period. Homemakers, the Deputy Administrator reasoned, was an established firm with a network of contacts in the medical profession. Although Homemakers expanded and altered the nature of its services in 1979, and as a result experienced higher costs per patient, the Deputy Administrator thought the change insufficient to call Homemakers "newly established" for purposes of the Medicare program. His opinion distinguished between a newly established service (such as entering the nursing business) and a change in an established service (such as substituting registered nurses for licensed practical nurses and providing more specialized care).

The fifth and next step was the district court, which granted summary judgment to the Secretary. The court held that the Department's construction of its own regulation is entitled to deference because, although perhaps not the best reading, it is plausible enough to be respected. Once the Department prevailed on the legal question, the court thought, it followed that substantial evidence supported the decision. Homemakers has been in the home nursing business since 1968, represented to Illinois in 1978 that it was a thriving firm supplying home health care of all sorts, and could not turn around and tell the Department that it was not really in the "home health agency" business until 1979. The sixth step is the appeal to us.

Homemakers concedes that the 1984 regulation, making eligibility turn on whether for more than three years the firm provid-

ed "health care services equivalent to" those it could have provided under the Medicare program, is within the Secretary's statutory power. Although there is a dispute about substantial evidence, to which we return, Homemakers recognizes that if the equivalency test applies, it is likely to lose that fight. It therefore vigorously disputes the Secretary's conclusion that the 1979 regulation and the 1984 regulation mean the same thing. The change in language, which the Secretary describes as a clarification, Homemakers finds to be a revolution, which under the Administrative Procedure Act, 5 U.S.C. § 551, may not be applied retroactively. See *Georgetown University Hospital v. Bowen*, 821 F.2d 750, 756–58 (D.C.Cir.1987). Homemakers thinks that any fool can see that "type of provider" (the 1979 language) is different from "services equivalent to those that would have been covered" (the 1984 language). A "provider" is a technical term under the Medicare laws denoting a supplier eligible for reimbursement, and Homemakers reads "type of" provider to distinguish among the statutory categories, such as "home health agencies", hospitals, and physicians. In all events, Homemakers insists, the firm must have been a "provider" or have been eligible to be one. The Secretary replies to the emphasis on "provider" with an emphasis on "type", which the Secretary wants to read in the lay sense of equivalent services. A hospital does not furnish the same "type" of services as a nursing agency, but one nursing agency is apt to furnish the same "type" of services as another, qualified for reimbursement or not. The ambiguity—whether to read the 1979 regulation in a technical or lay sense—was clarified in 1984, according to the Secretary. A new regulation excluding the technical reading of the old one is no change at all.

Regulations in so technical a field as health care reimbursement presumptively have a technical meaning. When the Secretary writes "provider" he should expect a court (and a supplier of medical care) to read the term as a reference to a *statutory* "provider"; then "type of" distinguishes among different categories of providers.

So Homemakers' reading of the 1979 regulation is one we probably would adopt as an independent matter. But we are not independent. We are reviewing the Secretary's decision and not offering an original construction of the 1979 regulation. As in so many cases of this sort, the question boils down to one about deference. Are we entitled to state an independent conclusion?

The usual answer to this question is No. An agency's construction of its own regulation binds a court in all but extraordinary cases. *Lyng v. Payne*, 476 U.S. 926, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bedford Medical Center v. Heckler*, 766 F.2d 321, 323 (7th Cir.1985). An ambiguous legal rule does not have a single "right" meaning; there is a range of possible meanings; the selection from the range is an act of policymaking. The person who fleshes out the meaning of the rule is the true law-giver in the circumstances.

When the legal rule binds the agency—for example, when it appears in the Constitution—courts do not adhere to the agency's views, because the agency lacks discretion to set policy. When the legal rule appears in a statute, the first question in determining the deference appropriate to the agency's construction is whether Congress has transferred discretion to the agency. If the legislation either calls for the agency's decision or contains no disposition of the subject, then the agency has been deputized to make a rule, and its decision should be respected. When Congress tries to settle the subject on its own, however, the agency is not the policy-maker, and its opinion is entitled to correspondingly little force. Compare *INS v. Cardoza–Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 1220–22, 94 L.Ed.2d 434 (1987), with *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). The extent to which the agency wields authority to make policy affects the deference appropriate to its acts of con-

struction in the implementation of that power; when the courts substitute their views on legal questions for those of a policy-making agency, they either assume the administrative function or transfer it back to the (sitting) Congress, which must decide whether to amend the statute.

Different statutes transfer different sorts of implementing authority to agencies, and therefore there is not one but many standards of deference when agencies interpret statutory language. When a court deals with the interpretation of regulations, however, it can be sure that the agency possesses the full power of implementation. The parties agree that the 1979 language (as Homemakers interprets it) and the 1984 language (as the Secretary interprets it) are equally within the Secretary's power under the statute.[1] Choosing which policy to pursue is wholly an administrative task. When a court says, as we do today, that judges appropriately "defer to the agency's construction of its regulation", this means that judges leave policy-making to the policy-makers appointed by Congress. Because neither interpretation could be "wrong" in the sense that it violates a constraint imposed on the agency by other arms of the government, the selection among them is one of the agency's delegated tasks. It is a substantive decision binding on the courts in the same way an authorized regulation or statute binds.

Accepting the agency's interpretation of its own regulation not only respects the allocation of decision-making power within the government but also ensures that a single interpretation prevails. There is only one Secretary of Health and Human Services, but there are 13 courts of appeals and more than 500 district judges. A question is debatable when it could be decided in different ways by reasonable people; it is therefore predictable that debatable questions will be decided different ways by

different judges. Deference to the agency's view permits a nationally uniform rule without the need for the Supreme Court to essay the meaning of every debatable regulation.

Despite all of this, courts decline to abdicate as opposed to defer to the agency's decision. There are sound reasons for this, which illustrate the foundation of the usual principle of deference. The judicial responsibility to accept the agency's interpretation comes from the existence of (a) a *decision* that was (b) taken in a procedurally regular way. When an agency waffles without explanation, taking one view one year and another the next, this may show the absence of a real decision (that is, confronting the problem before resolving it). Courts are correspondingly less willing to accept the agency's latest word as authoritative; maybe it is no better and no more enduring than the last warble. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). A *volte face* also may be an attempt to avoid the notice and opportunity for comment that the Administrative Procedure Act requires for the alteration of a rule. When an agency gets out the Dictionary of Newspeak and pronounces that for purposes of its regulation war is peace, it has made a substantive change for which the APA may require procedures. If in the air bags case, *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), instead of repealing the rule the agency had proclaimed that an ordinary seat belt is a "passive restraint", the Court would have treated this the same as it treated the revocation of the rule. Both require notice, an opportunity for comment, and an adequate record. A change in interpretation announced in administrative adjudication may avoid the formal requirements of notice and comment, but it too requires reasons. *Motor Vehicle*, 463 U.S. at 42, 57,

---

1. Most of the cases on which Homemakers relies to curtail the deference to be granted to the Secretary dealt with claims that the regulation, as interpreted, was unauthorized by the statute. E.g., *St. James Hospital v. Heckler,* 760 F.2d 1460 (7th Cir.1985); *Northwest Hospital, Inc. v. Hospital Service Corp.,* 687 F.2d 985 (7th Cir.1982).

Certainly judges must police the boundaries of an agency's statutory authority, but that is not the problem in today's case. Indeed, the Secretary has eliminated the exception for home health agencies, 52 Fed.Reg. 21216, 21223–25 (June 4, 1987), a step within his statutory power.

103 S.Ct. at 2866, 2874; *Automobile Workers v. NLRB*, 802 F.2d 969, 974 (7th Cir. 1986).

Homemakers contends that the Secretary's interpretation of the 1979 regulation is both newfangled (avoiding requirements under the APA) and inconsistent with earlier interpretations. If either is true, this affects our review.

The "inconsistency" position may be dispatched quickly. The Deputy Administrator's decision in Homemakers' case was the Secretary's second public statement on the meaning of the 1979 regulation. The first came in 1984, when the Secretary, in amending the regulation, stated that the 1984 version clarified rather than changed the meaning of the 1979 version. 49 Fed. Reg. 20616, 20628 (May 15, 1984). The Deputy Administrator's decision 20 months later is entirely consistent with the Secretary's position in 1984. Although Homemakers observes that the Secretary's minions have taken different views of § 405.-460(f)(7), this demonstrates only that the Department of Health and Human Services is a mammoth bureaucracy with seemingly endless layers of internal review, and that reasonable people disagree about the meaning of the 1979 regulation. "The Secretary's position" is the position of the Department as an entity, and the fact that people in the chain of command have expressed divergent views does not diminish the effect of the agency's resolution of those disputes. *Bauzo v. Bowen*, 803 F.2d 917, 921 (7th Cir.1986); *St. Francis Hospital Center v. Heckler*, 714 F.2d 872, 874 (7th Cir.1983) (disapproving, on this ground, the language in *St. John's Hickey Memorial Hospital v. Califano*, 599 F.2d 803, 813 n. 18 (7th Cir.1979), on which Homemakers relies). An inconsistent administrative position means flip-flops by the agency over time, rather than reversals within the bureaucratic pyramid.

■ Our conclusion that the Secretary has not changed his position necessarily disposes of Homemakers' contention that

an alteration so great requires notice and the opportunity for comment (with the result under 5 U.S.C. § 551(4) that the change runs prospectively). The agency has had only one position, although it has expressed that position in different words. Homemakers asks rhetorically why the Secretary used rulemaking to change the regulation if the new words did not convey new meaning. The answer is that once a regulation is adopted by notice-and-comment rulemaking (as the 1979 regulation was), its text may be changed only in that fashion.[2] The use of the APA's procedures therefore does not imply that the change is substantive. And the reason for making this change is apparent: the 1979 language produced confusion inside and outside the Department, confusion that the 1984 presentation eliminates. Far better to eliminate than to perpetuate confusion. New language need not imply new substance, *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984); *Rockford Drop Forge Co. v. Donovan*, 672 F.2d 626, 630 (7th Cir.1982), and here does not. The change in § 405.460(f)(7) was a minuscule part of a complex package of regulations, the sort of tidying-up to be encouraged rather than penalized.

So we have returned to where we began. The reading of the 1979 regulation most natural to a lawyer may support Homemakers, but this is not the inevitable reading. The Secretary has given the text a reading that is linguistically possible and makes sense in light of the purposes of the exception. The desire to allow new firms a higher price per service during the slack period of start-up does not imply that established firms also should receive higher prices just because they have elected to join the Medicare program and add to their menu of services. The Deputy Administrator drew this distinction, which is plausible and therefore carries the day.

On the Deputy Administrator's approach to the legal question, there is substantial evidence for the ultimate decision. Homemakers provided home nursing services for

---

**2.** The agency may, of course, add a gloss by interpretive rules, *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1329 (9th Cir.1982), may indeed continue to issue any interpretations that

would be admissible if the original rule were a statute. 5 U.S.C. § 553(b)(A). See also *Bellwood General Hospital v. Schweiker*, 673 F.2d 1043, 1044 (9th Cir.1982).

a decade before it joined the Medicare program. That it chose the occasion of its access to federal funding greatly to enlarge its size and upgrade the quality of service supplied does not compel a conclusion that it is supplying a new "type" of medical care. The Secretary is entitled to say, as he did, that home nursing is a distinct type of care, and that migration within this type does not activate new periods of entitlement to extra reimbursement. He was entitled to conclude, as he did, that Homemakers' approach would encourage firms to add new nursing services from time to time to step up their rate of reimbursement, while existing firms supplying the same service were paid less. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), quoted in, among many cases, *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The district court held that a reasonable mind could contain the Deputy Administrator's conclusion. We agree.

AFFIRMED