ILLINOIS SOUTH PROJECT, INC., et al., Plaintiffs–Appellants,

v.

Donald P. HODEL, Secretary of the Interior, et al., Defendants–Appellees.

No. 87–2366.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1988.

Decided March 30, 1988.

---

Bradley B. O'Brien, Martin, Craig, Chester & Sonnenschein, Chicago, Ill., for plaintiffs-appellants.

Robert E. Wagner, Sp. Asst. Atty. Gen., Pfeifer & Kelty, Springfield, Ill., Martin W. Matzen, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before POSNER, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328, establishes rules for the strip mining of coal. See *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). A state may regulate in the federal government's stead if it uses criteria "in accordance with" the Act and "consistent with" the federal implementing regulations. 30 U.S.C. § 1253(a)(1), (3), & (7). Illinois is one of the principal producers of surface-mined coal, much of it inexpensive and so in demand. Regulations concerning the mining of this coal were bound to draw protests. The state submitted a proposed regulatory system in March 1980 and has been locked in controversy ever since.

Part of the delay comes from the difficulty the Department of the Interior has encountered in promulgating regulations satisfactory to the courts of the District of Columbia, which have exclusive jurisdiction to review the federal regulations. 30 U.S.C. § 1276(a)(1). A series of decisions remanded one or another rule to the Secretary for more work. The most recent case, *National Wildlife Federation v. Hodel*, 839 F.2d 694 (D.C.Cir.1988), resolves many

of the issues but leaves some open, and two decisions that were not appealed set aside additional regulations important to Illinois. We shall have to create still more delay on account of open questions about the federal regulations.

Another part of the delay stems from the defects in the state's proposals. The Secretary rejected the state's first proposal in part, 45 Fed.Reg. 72468 (1980), and gave Illinois until the end of 1980 to submit a complying program. A state court forbade state officials from submitting a new plan until December 1981. *Illinois Coal Ass'n v. Illinois Department of Mines and Minerals*, No. 80–CH–303 (7th Cir. Sangamon County). The Secretary approved the new proposal conditionally in 1982, 47 Fed.Reg. 23858 (1982), but ongoing changes in the federal regulations (some on the Department's initiative, some on the courts') led to a remand for further consideration. On April 4, 1984, the Secretary approved the Illinois program. 49 Fed.Reg. 13494 (1984).

The plaintiffs, ten organizations (collectively Illinois South), contended that the program was defective in 52 separate ways. We can believe that there are 52 errors in the 250 + pages of microscopic type that make up the state's regulatory program, but the blunderbuss attack did not conduce to speedy resolution of the case. The parties whittled the disagreements down to 26 (often by the capitulation of the state and the modification of its plan), which the district court resolved by granting summary judgment in favor of the defendants. In this court Illinois South reduced its challenges to seven (though with subparts), now six because it abandoned a further point in light of *National Wildlife Federation*.

■ 1. *Valid Existing Rights.* The Act puts certain lands off limits to strip mining, including lands of historical interest and special ecological vulnerability. 30 U.S.C. § 1272. The exclusion does not apply, however, "to lands on which surface coal mining operations are being conducted on August 3, 1977, or under a permit issued pursuant to this chapter, or where

substantial legal and financial commitments in such operation were in existence prior to January 4, 1977", § 1272(a)(6), or, to put it differently, lands "subject to valid existing rights" on August 3, 1977, § 1272(e). The Secretary's first regulation, 44 Fed.Reg. 15342 (1979), 30 C.F.R. § 761.5 (1980), defined this exception as covering property rights (including leases) held by the mine operator on August 3, 1977, but only if the operator either held by that date a permit to conduct mining or demonstrated that the land in question was immediately adjacent to and needed for an operating mine. The district court upheld this definition in *In re Permanent Surface Mining Regulation Litigation*, 14 E.R.C. 1083, 1090–92 (D.D.C.1980), on the understanding that a good faith effort to obtain a permit before August 3, 1977, would be treated as a permit in force then.

The Secretary promulgated a new "valid existing rights" regulation in 1983, 48 Fed. Reg. 41313–16, 41348–49, 30 C.F.R. § 761.5 (1986). The new language provided that if the operator had enough of a property interest that the application of the criteria of § 1272 would "take" the property and require the payment of "just compensation" under the Constitution, then the interest was to be treated as a "valid existing right"; otherwise not. This converted all regulatory questions into constitutional questions—and, one might suppose, shrunk the category of "valid existing rights", for the district court that sustained the 1979 regulation had held that the limits on that definition did not produce any takings. The Secretary expressed concern in 1983, however, that the 1979 regulation would lead to a call on the Treasury by displacing property rights, and reasoned that the revision would prevent this. On this reading, the 1983 rule may recognize as "valid existing rights" at least some interests denied that status by the 1979 regulation. Illinois proposed a "valid existing rights" clause consistent with the 1983 regulation, and the Secretary approved that clause under the 1983 regulation. 49 Fed.Reg. 13499–13501 (1984). The district court with exclusive jurisdiction over the federal regulations held in 1985, however, that the 1983 regula-

tion had been promulgated without the necessary notice and opportunity for comment. *In re Permanent Surface Mining Regulation Litigation,* 22 E.R.C. 1557 (D.D.C. 1985). The Secretary did not appeal but did not issue a new rule either, apparently waiting for the resolution of related issues in *National Wildlife Federation,* at 748–51. As the district court saw this case, then, the "valid existing rights" provision of the Illinois plan conformed with a regulation that no longer existed, but might be repromulgated or modified.

The district court wrote that "a determination of whether Illinois' definition of [valid existing rights] is consistent with the federal definition ... must await the Secretary's formulation of a new definition". Nonetheless, the district court granted summary judgment for the defendants, thereby approving the existing regulation. Illinois South attacks this disposition, contending that the vacation of the 1983 regulation restored to force the 1979 regulation, see *Action on Smoking and Health v. CAB,* 713 F.2d 795, 797 (D.C.Cir.1983); cf. *Appleton Memorial Hospital v. Bowen,* 814 F.2d 408 (7th Cir.1987); the Illinois rule is inconsistent with the 1979 regulation and so must perish.

The three sets of defendants offer different arguments. The federal appellees rely on the Secretary's statement acquiescing in the D.C. district court's decision:

> In a few instances, State program amendments were approved based on the 1983 revisions. State programs will remain in effect until the Director of OSMRE has examined the provisions of each State program to determine whether changes are necessary and has notified the State regulatory authority pursuant to 30 CFR 732.17(c) and (d) that a State program amendment is required.

51 Fed.Reg. 41952 (1985). The state officials contend that the Illinois regulations are at least as effective as the 1979 federal regulations and so may be approved under them. The Illinois Coal Association, which intervened as a defendant to represent the interests of mine operators, insists that the D.C. decision of 1985 did not resurrect the 1979 regulations, and that final disposition therefore must await the new rules.

None of these arguments supports what the district court *did,* as opposed to what it *said:* what it did is enter judgment in favor of the state's regulations. Take the state's argument first. Perhaps the Secretary could have approved Illinois' proposal under the 1979 regulation, but he did not. He evaluated the proposal under the 1983 rule, intimating that it was the change that made the state's proposal satisfactory. We may not approve an administrative decision on the basis of a ground advanced by counsel but not the agency. *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). The Association's argument may show that a court ought not *disapprove* the proposal on the basis of a superannuated regulation (a question we do not decide), but it hardly shows that the court may *approve* a proposal that rested on an invalid regulation. The Secretary's argument is simply beside the point. The published statement informed states that the Secretary would take the lead in informing them what any new regulation required. It did not and could not control the disposition of cases then pending, cases in which the state rules in question had never become effective.

Courts should apply the law in force at the time of decision. *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The law in force today is surely not the 1983 regulation. The 1979 regulation regained currency when the 1983 regulation died, but its prospective significance is cloudy. The Secretary's statement in 1985 did not suggest that he would apply that rule to any pending matter, because although procedurally valid the 1979 rule no longer expressed the Secretary's substantive views. The Secretary would have to use the 1979 rule as the basis of any current substantive decision, but the Secretary's principal response has been to defer decisions pending a new, valid rule. The only thing clear to us is that the Secretary wanted to take a new look at the "valid existing rights" question as soon as he had a new regulation in place. An agency may do this if it

acts "with all deliberate speed" to generate and implement a new regulation. *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 619, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488 (1944); cf. *Burlington Northern, Inc. v. United States*, 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982). The Secretary's approval of the Illinois proposal under the defective 1983 regulation cannot stand; we therefore vacate the district court's decision to the extent it granted summary judgment to the defendants on this issue. We remand with instructions to return this subject to the Secretary for further proceedings under whatever regulation is in force at the time the Secretary issues a fresh decision. If the Secretary wishes to use something like the 1983 regulation, he had best promulgate it.

■ 2. *Deferred Designation Decisions.* Section 522(c) of the Act, 30 U.S.C. § 1272(c), permits any potentially affected person to petition the applicable regulatory agency "to have [an] area designated as unsuitable for surface coal mining operations". It requires the agency to hold a hearing on the petition within ten months, and to issue a decision within 60 days of the hearing. In 1983 the Secretary issued a regulation permitting regulatory officials to defer decision concerning such a petition until there was a prospect that someone would want to use the lands for mining. 48 Fed.Reg. 41352–53 (1983), 30 C.F.R. § 764.15(a)(3) (1984). The Secretary saw this as a sensible way to alleviate the burden of deciding unnecessary petitions and obtaining an adversarial presentation from persons interested in alternative uses of the land. The only district court with jurisdiction on this question saw this as a clear violation of the statutory rule, and set aside the regulation. *In re Permanent Surface Mining Regulation Litigation*, 620 F.Supp. 1519, 1541–44 (D.D.C.1985). The Secretary acquiesced in this decision, 51 Fed.Reg. 41956, 41961 (1986).

While the 1983 regulation was in force, however, the Secretary approved the portion of Illinois' plan taking advantage of the right to defer decision. 49 Fed.Reg. 13501 (1984), approving 62 Ill.Adm.Code § 1764.15(e). Illinois South challenged this on the basis of the 1985 decision. The district court's opinion did not mention the subject.

The Secretary submits that this question is moot. The Secretary has issued a formal notice to Illinois that its program is deficient and assures us that Illinois has submitted an amendment to its plan deleting the offending provision. Curiously, however, Illinois defends the existing regulation on the merits, without reference to the decision abrogating the federal regulation in question. The state maintains that even with the deferral provision, its rule is no less effective in protecting genuine interests than is federal law. Its apparent contention, in other words, is that state regulatory systems may depart from the requirements of the Act, so long as they are as effective in the long run. The district court did not address this contention and may never have to. As things stand, we are uncertain about the status of the state rule. If Illinois plans to enforce its deferral rule, the case is not moot. We therefore vacate this portion of the district court's decision and remand with instructions to determine whether Illinois still seeks to apply the deferral portion of its regulations. If the state does so, the district court must decide the question on the merits; if the state does not, the court should dismiss this aspect of the litigation as moot.

■ 3. *Defining a "Complete" Application.* Strip mining requires a permit under the Act. The would-be operator must submit an application containing information that permits the agency to evaluate all of the criteria the statute makes relevant to the decision. 30 U.S.C. § 1257(b). Until the applicant has submitted a complete application, the agency need not act. The filing of a complete application triggers a sequence of deadlines, however. The agency must ensure that the application is published; any interested person has 30 days to submit comments. 30 U.S.C. § 1263(b). If the published application turns out to have been incomplete, the statutory period for comment may be gone before the interested person has the information needed to evaluate the proposal.

To prevent the erosion of the statutory opportunity to submit comments, the Secretary's regulations provide that the time does not start until a complete application is on file. 30 C.F.R. § 773.13(a), (b). This means

an application ... which the regulatory authority determines to contain information addressing each application requirement of the regulatory program and to contain all information necessary to initiate processing and public review.

30 C.F.R. § 701.5. Illinois submitted, and the Secretary approved, a definition under which

a complete application is one on which the applicant has made an apparent good-faith effort to adequately address the portions of the application pertaining to the operation to be permitted.

62 Ill.Adm.Code § 1771.11(b)(1). This is different from the federal rule, so it is necessary to decide whether the state rule is "in accordance with" the Act and "consistent with" the regulations—in the Secretary's paraphrase, is no less effective than the federal rules in achieving the Act's objectives. 30 C.F.R. § 730.5.

One difference is that the federal regulation defines "completeness" in terms of approval by the agency; the state regulation defines completeness in terms of the information content of the application. Illinois South makes nothing of this difference, so we do not pursue it. The difference about which Illinois South complains is the reference to "apparent good-faith effort" in the state rule. The Act and federal regulation require more than "effort", Illinois South says; they require success. That the effort is made in good faith does not produce the necessary success. Illinois South reads § 1771.11(b)(2) to permit the state to treat as "complete" an application that is actually incomplete, but which was filled out in good faith. And that, it insists, is far less effective than the Act, because it will prevent public comment on essential elements of the proposal.

The Secretary reads § 1771.11(b)(2) differently. He treated "good-faith effort" as a requirement *on top of* actual completion. The statute calls for the application to contain a lot of data; sometimes the applicant will complete the application by guessing about important information. One could read the federal regulation as calling an application "complete" so long as every blank line had been filled in, even if the operator had picked the numbers out of the air. The Illinois rule, the Secretary thought, requires the applicant to make a "good-faith effort" to complete the application accurately—and not your everyday "good-faith effort" but an "apparent" good-faith effort. He explained, 49 Fed. Reg. 13503:

Both the Illinois and Federal definitions include the requirement to address the pertinent application requirements and Illinois adds a requirement that they be "adequately" addressed. Illinois has also added the phrase "apparent good-faith effort" to modify the requirement. The Secretary believes that a good-faith effort means one where the applicant has made a diligent, substantial effort and that a good-faith effort would not be present where the application failed to address all the necessary information requirements. The Secretary further believes that the use of the qualifier "apparent" means that the applicant's good-faith effort must be obvious; that is, it must be plainly evident from the application itself.

The adequacy of the state's regulation obviously depends on which reading is the right one. On Illinois South's reading, the language falls well short of the mark; on the Secretary's, it goes well beyond. The state's brief supports the Secretary's reading. Why, if this is what Illinois meant, it chose such two-faced language is a mystery to us, but not one we need resolve. All language conceals ambiguities. What the Secretary has approved is not the language in the raw, but the text as interpreted. To give it any other meaning in the future is to amend the rule; Illinois may not do this without a new submission to the Secretary. If Illinois should change its regulation—by promulgating a new one or by reinterpreting the old one—without the Secretary's approval, Illinois South would

be entitled to a declaration from the district court that the State was not in compliance with the Act.

This is not to say that any misapplication of the regulation is the same as an unauthorized new one; we need to know how the State applies its rule in the run of cases and not in the exceptional ones. Thus Illinois South's contention—and the State's concession at oral argument—that state officials erred in treating as complete the application of the Sahara Coal Co., which lacked a presubsidence survey, is unimportant. Mistakes in the application of any complex statute are inevitable. (The regulatory officials of Illinois ultimately ordered Sahara to supply the study and restarted the 30–day period for comments.) The Act governs the establishment of norms and ensures that there will be means to deal with errors. We are satisfied that the state's rule, as the Secretary has construed it, is a satisfactory norm. State courts are open to claims of improper application, as the district court is open to claims that the state has selected a new norm.

■ 4. *Restoring the Approximate Original Contour.* Section 515(b)(3), 30 U.S.C. § 1265(b)(3), requires the mine operator to "restore the approximate original contour of the land with all highwalls, spoil piles, and depressions eliminated". Compliance usually entails removing the topsoil in one operation, 30 U.S.C. § 1265(b)(5), followed by removing the clay and rock covering the coal (the "overburden"). The removed materials are "spoil". The overburden is dumped into piles near the mine while the operator removes the coal. The process then is reversed, replacing the overburden, compacting and regrading this aggregate, and replacing the topsoil. The technique produces problems even on flat lands; we need not consider the greater problems that arise with steep slopes.

If the "stripping ratio"—the ratio of overburden to coal volumes in the mined area—is low, there will not be enough spoil to fill the cut. A high stripping ratio produces more spoil than the cut will hold. Breaking up the overburden creates air pockets (the pieces of a smashed brick occupy a greater volume than the brick did, unless you reassemble the pieces like a jigsaw puzzle), and the material expands by some 15–40% (depending on how compact it was before being disturbed). Both the Act, 30 U.S.C. § 1265(b)(3), and the Secretary's regulations, 30 C.F.R. §§ 816.104–.105, recognize this and allow variations on the original contour in these situations.

Illinois South does not (and may not) dispute these rules. Instead it portrays the practice in Illinois as follows: the mine operator removes the overburden in a long, thin strip known as a "box cut" and lays the spoil on the ground away from the seam of coal. Then the operator removes the coal from the first cut and makes a second box cut, putting the spoil from the second cut in the pit produced by the first. This reduces costs; instead of removing overburden, storing and returning it (handling everything twice), the operator moves most of the spoil only once. The process continues until the mining is completed. The last cut may be far away from the first. The operator leaves the first cut spoil where it is and neglects to fill the last cut. Eventually nature fills the last cut with water. Both the last cut lake and the first cut spoil violate the original contour requirement, according to Illinois South.

We do not doubt that if things are as stark as this, Illinois is out of compliance with the Act. Yet we do not see in the state regulations blanket permission for the practice Illinois South describes. Illinois South says that the practice persists because Illinois "allows operators to automatically treat their box cut spoil as excess spoil" (Br. 28) that may be left in place. It cites 62 Ill.Adm.Code §§ 1816.104–.105, but they say nothing of the sort. These regulations deal with overburden that is thin or thick relative to the coal seam, and they do not depart in this respect from the federal regulation that Illinois South accepts. There is nothing "automatic" about the privilege to treat spoil as "excess"; that may be done only when "the final thickness is greater than 1.2 of the initial thickness", § 1816.105(a), and even then only when

"surface mining activities cannot be carried out to comply with the Section 1816.101 to achieve the approximate initial contour."

A decision not to fill the last cut with spoil left over from earlier cuts is a potential source of excess spoil, but both the statute, 30 U.S.C. § 1265(b)(8), and the federal regulations, 30 C.F.R. §§ 715.17(k) and 817.49, permit mine operators to create lakes under some circumstances; Illinois South does not contend in this court that the state's regulations in this regard offend the federal rules. It made this argument in the district court and lost. The Act is a compromise among competing interests, and § 1265(b)(8) is one of the concessions obtained by the mining interests. Illinois South cannot protest that the spoil created by permitted lakes is treated as excess. How else would one treat it?

Illinois South still objects, however, to 62 Ill.Adm. Code § 1816.71(g)(2), which allows operators to leave a final slope as steep as 25% on excess spoil. This cannot be the "approximate original contour" in the Great Plains, it insists, and it protests that such a slope contributes to the wall-like appearance of left-over spoil piles. Again the difficulty is not so much with the proposition that a rule giving mine operators a right to leave walls of spoil in the midst of flatlands would violate the Act as it is with the fact that § 1816.71(g) does not say what Illinois South attributes to it. Subsection (2) contains a 25% rule, but in context it reads (emphasis added):

g)
1) The final configuration of the fill must be suitable for postmining uses approved in accordance with Section 1816.133, except that no depressions or impoundments shall be allowed on the completed fill. *In addition:*
2) Box cut spoils shall *blend with undisturbed land* with a *maximum* outslope steepness of twenty-five (25) percent (4h;1v)

This means that the mine operator may select a slope as steep as 25% in order to match a hilly terrain. It is hard to read this language as permitting disruptive, unsightly walls of spoil to be scattered willy-nilly through Illinois. The Secretary did not err in approving these regulations.

■ 5. *Coal Under Water.* The water of the last-cut lakes often abuts the seam of coal. (It will do this when the mine operator does not exhaust the seam, so that land adjacent to the lake contains coal, which will form the lower part of one wall of the lake.) Water may come in contact with coal at other times. Illinois South contends that coal and water must be separated, relying on § 515(b)(10), 30 U.S.C. § 1265(b)(10), which requires states to

minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation by—

(A) avoiding acid or other toxic mine drainage by such measures as, but not limited to—

(i) preventing or removing water from contact with toxic producing deposits;

Illinois coal is high in inorganic iron-sulfur compounds (FeS or $FeS_2$). Sulfur, free oxygen ($O_2$), and water ($H_2O$) can react in the presence of iron (a catalyst in this process) to yield sulfuric acid ($H_2SO_4$). So according to Illinois South, Illinois coal is a "toxic producing deposit" that must be kept away from water. Yet 62 Ill.Adm.Code § 1816.103(a)(1) provides:

A person who conducts surface mining activities shall treat, or shall cover, with a minimum of four (4) feet of the best available nontoxic and noncombustible earthen material, all acid-forming materials, toxic-forming materials, combustible materials, or any other materials identified by the [state] as exposed, used or produced during mining; provided, that the pit floor and the highest coal seam may be covered with a minimum of four (4) feet of water. . . .

Illinois South maintains that this provision, allowing water to cover coal, is inconsistent with § 1265(b)(10)(A)(i).

The Secretary nonetheless approved the state's rule, 49 Fed.Reg. 13513–14 (1984),

on the basis of a decision that is beyond challenge here. The sulfur compounds in coal react with water to form sulfuric acid only in the presence of oxygen. (They may also react in the presence of bacteria such as *thiobacillus ferroxidans,* but Illinois South does not discuss this route, and the subject is in any event beyond the scope of our review.) The Secretary determined that still water at a depth greater than 10 meters does not contain enough free oxygen in solution to form sulfuric acid. 48 Fed.Reg. 23369 (1984), 30 C.F.R. § 816.102(f). Only the District of Columbia courts are authorized to upset that regulation. The Secretary approved the Illinois rule on the understanding that "at least four feet" would mean, in practice, "no less than ten meters". 49 Fed.Reg. 13514 (1984). The state avows that this is both the meaning and the practice in Illinois; Illinois South does not disagree. As we remarked above, a rule means what it has been interpreted to mean (though it would certainly help things to revise the text). Given the Secretary's finding, when the surface of the water is more than ten meters above the top of the coal seam, even high-sulfur coal is not a "toxic producing deposit". Illinois South's argument therefore fails for want of a factual underpinning.

■ 6. *Attorneys' Fees Against the State.* The Act contains two provisions regarding awards of attorneys' fees. Section 520(d), 30 U.S.C. § 1270(d), provides that in litigation under the statute a court "may award costs of litigation (including attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." Cf. *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) (a statute of this character permits the award of fees only to parties who have achieved some success in the litigation). Section 525(e), 30 U.S.C. § 1275(e), provides that when a court issues an order under § 525 "or as a result of any administrative proceeding under this chapter ... a sum equal to the aggregate amount of all costs and expenses (including attorney fees) as determined by the Secretary to have been reasonably incurred ...

may be assessed against either party as the court, resulting from judicial review or the Secretary, resulting from administrative proceedings, deems proper." (Although this speaks of the "Secretary", the parties assume that when the state assumes regulatory jurisdiction it assumes the Secretary's role as well; we do likewise without passing on the subject.)

Only "parties" need pay attorneys' fees under these sections. The Act does not specify what this means, but there is a logical implication. In administrative proceedings the "parties" include the mine operator and any intervenors; the agency (state or federal) is not a "party" to the proceeding in which it is adjudicator. In judicial proceedings, however, the agency may become a "party", as the defendant in the case, and the parties before the agency may not be parties in court (unless they intervene). Thus when a person objecting to the award (or terms) of a permit prevails against the mine operator before the agency, the mine operator is responsible for the prevailing party's attorneys' fees (if any be awarded), and when a person prevails in court against the agency, then the agency is presumptively answerable in fees.

Illinois has a statute and regulation adopting this approach. Ill.Rev.Stat. ch. 96½ ¶ 7908.05 provides that if a court declares that the mining regulator has violated the law, then it may require the agency to pay attorneys' fees to the prevailing party. No statute authorizes the award of fees against the agency to a party who prevails in proceedings before the agency, and in Illinois the doctrine of governmental immunity therefore would bar such an award. The state's regulations, 62 Ill. Adm.Code § 1843.22(e), provide that the mine operator must pay the attorneys' fees of prevailing parties in the administrative proceedings (if fees are otherwise appropriate). This tracks the federal statute: the mine operator pays when it is the party before the agency, as the agency pays when in turn it becomes the party in court. The system is "in accordance with" the Act, and the Secretary approved it. 49 Fed. Reg. 13518 (1984).

The state's system also must be "consistent with" federal regulations, and here we encounter difficulty. The Secretary promulgated a regulation, 43 C.F.R. § 4.1294(b), stating that "attorneys' fees may be awarded" by the federal Office of Surface Mining to any person other than a mine operator who "initiates or participates in any proceeding under the Act upon a finding that the person made a substantial contribution to a full and fair determination of the issues." Illinois South contends that to be "consistent with" this regulation, the state must itself pay attorneys' fees to private parties in administrative proceedings.

We have some doubt about the force of the federal regulation. Section 4.1294(b) permits but does not require the federal agency to award attorneys' fees to helpful parties. For all we can tell, it has never awarded fees under this regulation, and as a practical matter Illinois South may have no greater chance of obtaining fees from the Office of Surface Mining than from the state agency. We do not know, for example, whether Congress has appropriated funds to pay any awards under § 4.1294(b). The dispute therefore may be one about theory only, and state regulations omitting a detail irrelevant in practice may be no less "effective" than the federal system.

If this is not a sterile dispute, however, "consistency" and "effectiveness" must depend more on the ability of the state to achieve the objectives of the federal rule than on selection of identical means to do so. Congress did not require states to implement federal regulations jot and tittle. States may select their own devices, provided they head in the direction the federal rules point and get as far.

A regulation such as § 4.1294(b) could have two objectives: to deter unlawful behavior (both by requiring wrongdoers to bear the full cost of their conduct and by attracting private attorneys general to investigate and correct potential wrongdoing) and to compensate those whose costly efforts are instrumental in achieving compliance with the Act. Deterrence *of the agency* cannot play much role in § 4.1294(b),

because an award of fees does not depend on showing that the *agency* made an error. The regulation authorizes an award when the mine operator proposes some inappropriate conduct, and at the behest of a private party the agency says no. One ought not "deter" such conduct by the agency by awarding fees against it. The regulation is designed more to elicit helpful (but costly) advice and data that will lead to correct decisions—information the agency otherwise might acquire by hiring costly lawyers and experts—than to penalize the agency for making incorrect decisions. More, an agency may require the mine operator to reimburse it for any award. The federal regulation does not suggest, and Illinois South does not contend, that such a requirement would be inconsistent with federal rules. So long as the fees lawfully may be shifted to the mine operator, it is difficult to understand how the award would deter the agency itself from making errors.

The federal regulation must be designed to compensate rather than deter. This is how the Secretary treated it in saying that the availability of the mine operator to pay fees ensured consistency with the federal rule. We accept the Secretary's view of the objective of the Secretary's own regulation. *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 411–12 (7th Cir.1987). Illinois South then has two lines of attack. It insists that the mine operator may not be a party to the state administrative proceedings, so that compensation will be unavailable, and it maintains that even if the mine operator is a party it may be unable to pay an award.

The first of these contentions is unsupported. The state contended, and the Secretary found, that the mine operator invariably would be a party. Illinois South disagrees but does not identify any proceeding to which the mine operator would be a bystander. If a firm seeks a permit and someone else objects, the applicant certainly is a party. Illinois South has in mind a request to modify, suspend, or revoke an existing permit. In such proceedings, it believes, only the person making a request is a party. We cannot fathom how. Un-

less the permit holder is brought in, the agency lacks the authority to modify or rescind the permit. Several of the state's regulations allow alteration or revocation of permits, or the award of penalties for violation of the terms of permits, but all of these methods treat the mine operators as parties. See 62 Ill.Adm.Code § 1788 (review and revision of permits), § 1840 (inspection and review of compliance), § 1843 (notices of violation and cessation orders), § 1845 (civil penalties). Too, the Due Process Clause has something to say about notice and an opportunity to be heard when the government proposes to shut down operating coal mines. The mine operator therefore will be a party to proceedings before the agency. This is a sufficient reason for the Secretary to approve Illinois' program, although he had disapproved similar attorneys' fees rules proposed by two states that had neglected to give assurances that the mine operators always would be available to pony up. See 46 Fed.Reg. 61088 (1981) (Virginia); 45 Fed. Reg. 21579 (1980) (Montana).

Now there *are* some administrative proceedings to which mine operators would not be parties. For example, a petition to designate land as unsuitable for mining does not necessarily entail a mine operator or permit applicant as a party; the state's desire to defer such decisions until a serious proposal is on the table (and a potential permit applicant could become a party) is in trouble in light of Part 2 of this opinion. But Illinois South has not made anything of this kind of proceeding, either before the Secretary or in court, and we decline to adjudicate the case on the basis of illustrations we have had to cook up, to which the Secretary has never had an opportunity to respond—in the administrative process or here. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Unemployment Compensation Commission v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *Heiar v. Crawford County*, 746 F.2d 1190, 1197 (7th Cir.1984); *Myron v. Chicoine*, 678 F.2d 727, 731–33 (7th Cir. 1982) (collecting cases).

The second contention also has substance in principle but problems in practice. The mine operator's status as a party will not produce compensation if the operator lacks the assets to pay. A fatal difficulty with this branch of Illinois South's argument is that it was not advanced until oral argument in this court. The district court did not consider it, and it was not addressed in the briefs. We asked the parties to file supplemental memoranda on the question whether it was raised before the Secretary (whose opinion did not mention the problem). Illinois South told us that it had not raised this possibility but denied that the omission mattered. The Secretary's attorneys, who conducted a more diligent search, found a brief reference to the subject at page 125 of Illinois South's submission to the Secretary after the remand in 1984. The submission stated:

> [B]ecause of bankruptcies, jurisdictional problems, and other such questions it may be considerably more difficult to recover an award against a permittee than it would be against the State. For this reason alone the State's refusal to provide for awards against the State renders their program less effective than the federal standards on which it must be based.

The Secretary need not respond to so cursory a contention, and what was not brought to the Secretary's attention may not be urged as a reason to undo the Secretary's decision. This case illustrates the wisdom of that rule. What portion of mine operators is judgment proof? Have mine operators in other states failed to pay awards against them? How frequently? To what extent is recovery available even from judgment-proof operators under the performance bond, which every operator must post? See 62 Ill.Adm.Code § 1808.13(b). The bond may be used to pay for "regulatory requirements", *id.* at § 1808.14, which one would think is a fair description of a requirement to pay attorneys' fees. We cannot tell whether there is a "problem" of any kind. The Secretary is entitled to notice so that he can assess (if necessary, gather) data and make an informed decision, and data are an essential

ingredient of the legal argument as well. Brief, groundless speculation in a lengthy submission to the agency, followed by silence in the courts, hardly lays the foundation for a challenge to an administrative decision. We do not decide whether the state's regulation could survive a demonstration that the kind of mine operators likely to be hit with awards of fees are unlikely to be good for them.

The judgment is affirmed in part, vacated in part, and remanded for further proceedings consistent with parts 1 and 2 of this opinion.