**FIRST NATIONAL BANK OF CHICAGO, f/k/a NBD Bank, Plaintiff–Appellant, Cross–Appellee,**

v.

**STANDARD BANK & TRUST, Defendant–Appellee, Cross–Appellant.**

Nos. 98–2533, 98–2575.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1999.

Decided March 26, 1999.

Robert P. Hurlbert (argued), Dickinson, Wright, Moon, Van Dusen & Freeman, Chicago, IL, for Plaintiff–Appellant.

Richard M. Franklin (argued), Baker & McKenzie, Chicago, IL, for Defendant–Appellee.

Before FLAUM, EASTERBROOK and MANION, Circuit Judges.

FLAUM, Circuit Judge.

First National Bank of Chicago, known at the time relevant to this suit as NBD Bank ("NBD"), brought an action for declaratory judgment alleging that Standard Bank & Trust ("Standard Bank" or "Standard") failed to return certain checks to NBD in a timely fashion under the Expedited Funds Availability Act, 12 U.S.C. § 4010(d) & (f) ("EFAA"). Finding that the checks were returned in a timely fashion, the district court granted summary judgment to the defendant Standard Bank, and awarded it prejudgment interest on the returned checks. Standard claimed it was entitled to the average prime rate for the relevant time period. However, the district court used the three-month Treasury Bill rate—4.9241%—compounded quarterly. Both sides appeal. For the reasons set out below, we affirm the district court's decision that the checks were properly returned, but vacate the award of interest, and remand for entry of the proper measure of prejudgment interest.

## Background

This litigation revolves around which party—Standard or NBD—should absorb the losses resulting from a check-kiting scheme perpetrated against both of these banks in November, 1993.[1] On November 18, 1993, an individual presented to NBD checks with an aggregate value of $3,997,406.75, drawn on customer accounts maintained at Standard Bank, which NBD initially accepted. That day, the same person deposited $4,025,000.00 in checks at Standard, drawn on NBD customer accounts.

The following day, Friday, November 19, 1993, NBD presented the checks it received to Standard, and vice versa. La-Salle Bank, in its capacity as the collecting bank, charged both banks' accounts for the checks drawn on them, and provisionally credited each bank for the amount presented to them. On the next business day (Monday, November 22, 1993), NBD opted not to honor the checks, and returned all of the checks, totaling $4,025,000.00, to Standard Bank. Standard received notice of NBD's decision on Tuesday morning, November 23. That afternoon, Standard attempted to dishonor the checks it had received. Three of its bank officers dashed off to NBD's Operations Processing Center carrying checks totaling $3,785,441.35.[2] The checks were received by NBD at 3:58 p.m. that day, but NBD did not credit Standard's account for that sum.

1. This is the second appeal we have heard in this case. In *NBD Bank v. Standard Bank & Trust Co.*, 79 F.3d 37 (7th Cir.1996), we decided that federal courts have jurisdiction to resolve disputes between depositary institutions under the EFAA. *Id.* at 38.

2. Evidently, a Standard employee left behind a check for $211,956.40. The question of whether NBD must credit Standard Bank's account for this still remains in the district court. Even though this issue is pending before the district court, because Judge Gottschall certified that the returned checks and non-returned check matters have no substantial overlap, and that a final decision was made that disposed of all the issues relating to the returned checks, appellate jurisdiction lies.

On November 30, 1993, NBD filed suit, seeking a declaration that Standard Bank's return of the checks was not timely, because it neither met the "midnight deadline," nor any of the deadline's exceptions laid out in Federal Reserve Board ("the Board") Regulations appurtenant to EFAA. Standard Bank defended by arguing that its return was proper, and it counterclaimed for prejudgment interest.

On a motion for judgment on the pleadings, the district court originally found for NBD, but reversed its decision in light of a clarifying amendment[3] to the relevant Federal Reserve Regulations. The district court also decided that prejudgment interest was appropriate, but did not award the prime rate. Instead it chose a lower rate (the average T-bill rate) because of the absence of bad faith on NBD's part, and because this was a "close case." Each side appealed portions of the decision below.

## I.

■ NBD's appeal from the district court's order granting Standard Bank's motion for judgment on the pleadings is reviewed by this court de novo. *Rooding v. Peters*, 92 F.3d 578, 579–80 (7th Cir. 1996).

## A.

■ The legal question at issue is whether Standard Bank's return of the checks comports with Federal Reserve Board Regulation CC § 229.30(c)(1), 12 C.F.R. Part 229 ("Regulation CC"). Regulation CC's language states:

3. When we refer to Regulation CC, we refer to the pre-clarification version of that rule. The amended version is referred to as "post-clarifying amendment Regulation CC."

4. The statute Regulation CC was promulgated under, the EFAA, granted the Board the power to "supersede any provision of [state law] including the Uniform Commercial Code as in effect in [any state], which is inconsistent with this [Act] or such regulations." 12 U.S.C. § 4007(b).

(c) *Extension of deadline.* The deadline for return or notice of nonpayment under the U.C.C. or Regulation § 229.36(f)(2) of this part is extended:

(1) If a paying bank, in an effort to expedite delivery of a returned check to a bank, uses a means of delivery that would ordinarily result in the returned check being received by the bank to which it is sent on or before the receiving bank's next business day following the otherwise applicable deadline; this deadline is extended further if a paying bank uses a highly expeditious means of transportation, even if this means of transportation would ordinarily result in delivery after the receiving bank's next banking day.

As the text notes, Regulation CC extends the UCC's deadline, known in the vernacular as the "midnight deadline."[4] Under the UCC, a paying bank may dishonor or revoke its provisional settlement of a check before midnight on the next business day after it received the check. UCC § 4–301(a)(1); *Hanna v. First Nat'l Bank of Rochester,* 87 N.Y.2d 107, 637 N.Y.S.2d 953, 661 N.E.2d 683, 686 n. 2 (1995). While the Board favored the UCC's emphasis on expeditiously dealing with dishonored checks, it was concerned that the midnight deadline might unintentionally retard the return of checks. It noted "[b]ecause the return process must begin by midnight, many paying banks return checks by mail when a courier leaving after midnight would be faster." 52 *Fed.Reg.* 47119, 47123 (Dec. 11, 1987). Thus, the Board enacted the extension to the midnight deadline.[5]

5. This portion of the regulation only deals with when returned checks are dispatched. There is no dispute that the checks were *received* by NBD in a timely fashion. A paying bank expeditiously returns checks when it sends the returned check in such a manner that the check would normally be received by the depository bank no later than 4:00 p.m. of the second business day following the banking day on which the check was presented to the paying bank. *See* Regulation CC § 229.30(a)(1). Here, the checks were re-

NBD argues that the Board's extension of the midnight deadline does not apply here. It primarily points to a number of statements in Regulation CC's legislative history indicating that use of the extension is limited to banks which regularly use couriers services to return checks. However, NBD is putting the cart before the horse—before we delve into the Board's commentary on Regulation CC, we must first examine its language's plain meaning.

■ Administrative rules are subject to the same well-known maxims of construction as legislative statutes. *Alabama Tissue Ctr. v. Sullivan,* 975 F.2d 373, 379 (7th Cir.1992). As we recently noted, in statutory construction cases, "the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." *United States v. Kirschenbaum,* 156 F.3d 784, 789 (7th Cir.1998), (quoting *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992)). If we can decipher Regulation CC's meaning on its face, there is no need to examine legislative history absent extraordinary circumstances. *United States v. Hudspeth,* 42 F.3d 1015, 1022 (7th Cir.1994).

There is little in the text of the statute that supports NBD's argument that the extension is only available to banks which regularly or ordinarily use expedited delivery. Regulation CC extends the deadline when a paying bank "expedite[s] delivery of a returned check ..." and we note the singular "a returned check" rather than the plural "returned checks." *See Metropolitan Stevedore Co. v. Rambo,* 515 U.S. 291, 295, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995). Although it is not dispositive, this use of the singular suggests that Regula-

tion CC may apply to one-time single check transactions. Far more conclusive is the structure of the second clause, which allows a bank to extend the deadline when it "uses a means of delivery that would ordinarily result in the returned check being received by the bank to which it is sent on or before the receiving bank's next business day following the otherwise applicable deadline." NBD argues, implausibly, that this mandates that a bank ordinarily or routinely use a means of expedited delivery in order to avail itself of the extension. For "ordinarily" to have such meaning, however, it would have to modify the verb "uses," causing the sentence to read: "a bank may extend the deadline if it ordinarily uses a means of delivery that would result in the returned check being received...." Of course, in the actual regulation, "ordinarily" modifies the verb "would result," denoting that the bank's means of delivery must ordinarily result in return by the applicable deadline. Any other reading, including the one NBD proposes, is contrary to the clear import of the second clause.

NBD also points to Regulation CC's first clause, which allows banks to use the extension "in an effort to expedite delivery of a returned check to a bank." It argues that Standard Bank's efforts were not in "an effort to expedite delivery" of the dishonored checks. We disagree. There is no doubt that Standard Bank's executives drove the checks to NBD's processing center in order to speed up delivery.

This interpretation squares with a leading commentary on the UCC by Professors White and Summers. Analyzing the plain language of Regulation CC (before the clarifying amendment) White and

turned at 3:58 p.m. on the second business day (Tuesday, November 23, 1993) following the banking day on which the check was presented to Standard Bank (Friday, November 19, 1993).

In light of this, we are hard pressed to see what possible prejudice NBD could have suf-

fered if Standard actually failed to comply with the extended midnight deadline. The time of dispatch seems much less important than the time of receipt. Nevertheless, the Board has not indicated that failure to meet the requirements of the former is excused by compliance with the latter.

Summers posed—and answered—the following hypothetical:

> Assume that the payor bank received a $100,000 check on Monday morning and that it discovers on Wednesday morning that it failed to send the check back by Tuesday midnight (the midnight deadline), but it now wishes to dishonor the check. Under the UCC the midnight deadline would have passed, and unless it had an unusual defense, payor would be liable for the $100,000. *Regulation CC changes that.* If the bank can somehow get the check back to the depositary bank before that bank's close of business on Wednesday, it escapes liability under the UCC. That appears to be the meaning of the first sentence of [Regulation CC § 229.30(c)].

James J. White & Robert F. Summers, *Uniform Commercial Code*, at 325 (4th ed.1995) (emphasis · added). Although NBD brings other scholarly points of view to our attention, those positions appear less faithful to Regulation CC's actual text than White & Summers.

■ We only look past the express language of a regulation when it is ambiguous or where a literal interpretation would lead to an "absurd result or thwart the purpose of the overall statutory scheme." *United States v. Hayward*, 6 F.3d 1241, 1245 (7th Cir.1993). We see no ambiguity in Regulation CC which admits of the meaning NBD presses upon us. Also, a literal interpretation does not lead to an "absurd result"—there is nothing absurd about extending the midnight deadline irrespective of whether a bank avails itself of the extension once or repeatedly. Moreover, the reading we adopt does not thwart the purpose of the rule, which promoted the speedy return of dishonored checks over the postmark conscious "midnight deadline." *See* 52 *Fed.Reg.* 47112, 47140 (Dec. 11, 1987) (noting that Regulation CC "removes the constraint of the midnight deadline if the check reaches either the depositary bank or the returning bank to which it is sent on the banking day following the expiration of the midnight deadline or other applicable time for return.").

We briefly examine the rule's regulatory history for any signs that our decision would thwart the Board's intent. *United States v. Mueller*, 112 F.3d 277, 281 (7th Cir.1997) (where statute is clear, examining legislative history useful to "determine if it reflects a clearly expressed legislative intention" contrary to plain meaning.) (citation omitted). Regulation CC's regulatory history is not quite as clear as the text. Both sides present evidence from the available sources to support their statutory interpretations. Among other references, NBD points to Regulation CC's Official Commentary, which lists two circumstances in which the midnight deadline may be extended, one not relevant here. The putatively relevant circumstance is where "a West Coast paying bank ... ship[s] a returned check by air courier directly to an East Coast depositary bank even if the check arrives after the close of the depositary bank's banking day." Official Commentary § 229.30, 12 C.F.R. Part 22, App. E (1997). This does suggest that the intent of the regulation may not have been as broad as its wording indicates. On the other hand, the commentary notes that the West Coast/East Coast bank scenario is an "example" of a highly expeditious means of delivery. 12 C.F.R. part 229, App. E. The history also states that Regulation CC "pertains primarily to air courier arrangements from West Coast banks to East Coast banks." 53 *Fed.Reg.* 19372, 19418 (May 27, 1988). "Pertains primarily" suggests that other exceptions exist too, and that an overly constricted reading of when the extension applies would be inappropriate. After examining the relative regulatory history, we believe it is a wash. This works to NBD's detriment, because its inability to coax strong support from the regulatory history means that it cannot overcome the clear import of Regulation CC's words. *Oneida Tribe v. Wisconsin*, 951 F.2d 757, 761 (7th Cir. 1991).

## B.

Although our reading of Regulation CC finds little ambiguity, the Board issued a self titled "Clarifying Amendment" in 1997 to remove any doubt as to whether the midnight deadline applies to checks returned to avoid a kite. Assuming that our interpretation of the pre-clarification rule was incorrect—an assumption without which this analysis is superfluous—Standard argues that the Clarifying Amendment has retroactive effect. It was on this ground that the district court found for Standard Bank. NBD argues that the "Clarifying Amendment" was actually a legislative rule, and as such has no retroactive effect under *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).[6]

The Clarifying Amendment expunged the words "in an effort to expedite delivery of a returned check to a bank" from Regulation CC § 229.30(c)(1). 62 *Fed.Reg.* 13801, 13805 (March 24, 1997). This was done to remove any doubt as to whether an inquiry into the returning bank's motives was appropriate. *Id.* If this was merely a clarification, rather than a legislative change, *Bowen*'s ban on retroactivity is inapplicable. *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir.1993).[7] This is so because a clarification of an unsettled or confusing area of law "does not change the law, but restates what the law according to the agency is and has always been: 'it is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand.'" *Id.* (quoting *Manhattan General Equip. Co. v. Commissioner*, 297 U.S. 129, 135, 56 S.Ct. 397, 80 L.Ed. 528 (1936)).

NBD argues that despite the agency's taxonomy, this is not a "clarifying amendment" but instead a legislative rule. However, NBD starts from a disadvantage, because, for purposes of determining whether a rule should be retroactively applied, we give great weight to an agency's expressed intent as to whether a rule clarifies existing law or substantively changes the law. *Pope*, 998 F.2d at 483; *see also Nussbaum v. Mortgage Service America Co.*, 913 F.Supp. 1548, 1557 (S.D.Fla. 1995).[8] If the agency expressly communicates that its intention in issuing the regulation was to clarify rather than change existing law, courts should defer to such announcements unless the revisions are in plain conflict with earlier interpretations. *Pope*, 998 F.2d at 483. NBD points to three cases where courts have disregarded an agency's denomination of an amendment as clarifying. *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3rd Cir.1987); *Standard Oil Co. v. Department*

---

**6.** If the Clarifying Amendment is a legislative rule, NBD Bank wins. Under *Bowen*, an administrative rule only has retroactive effect if Congress expressly authorizes the agency to issue retroactive rules and the rule acknowledges its intent to apply retroactively. 488 U.S. at 208, 109 S.Ct. 468; *Orrego v. 833 West Buena Joint Venture*, 943 F.2d 730, 735 (7th Cir.1991). Because the EFAA does not expressly permit the Federal Reserve Board to issue retroactive legislative rules, if we classify this as one, it would not apply to the NBD–Standard Bank litigation.

**7.** NBD's arguments that *Pope* does not control are unavailing. The primary case it cites, *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) deals with legislative rulemaking, not clarifying amendments. *Landgraf* simply reaffirmed the ban on retroactive application of legislative

rules. *Id.* at 277, 114 S.Ct. 1483. As noted in footnote six, if this is a legislative rule, NBD prevails. *Landgraf* in no way undercuts *Pope*'s holding that we defer to an agency's clarifying/legislative classification, and that clarifying amendments may have retroactive effect. See *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 n. 3, 116 S.Ct. 1730, 135 L.Ed.2d 25 ("Where ... a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means.")

**8.** For a detailed explication of the rationale for Article III court deference to administrative agencies, see *Homemakers North Shore Inc. v. Bowen*, 832 F.2d 408, 411–13 (7th Cir.1987).

*of Energy,* 596 F.2d 1029 (Temp.Emer.Ct.App.1978); *Detroit Edison Co. v. EPA,* 496 F.2d 244 (6th Cir.1974). Absent from all of those cases is any mention of deference to administrative agencies, which is in stark contrast to this court's position. *See Homemakers,* 832 F.2d at 413.

We find it relevant that NBD points to no cases in which the court deferred to an agency's classification, but ultimately disagreed with its conclusion that an amendment was "clarifying." Nevertheless, we do not accept the Board's classification without any analysis, we only defer to it. *Homemakers,* 832 F.2d at 412. To totally abdicate would allow an agency to make substantive changes to rules retroactively under the guise of clarifications, which is clearly prohibited. *Pope,* 998 F.2d at 483.

█ In this analysis we review the regulatory record to confirm that this was a clarification of the law, and not a substantive change. *Id.* The strongest indication of a substantive change is inconsistency with a previously stated position. *Id.* at 483–84 ("We will defer to an agency's expressed intent that a regulation is clarifying unless the prior interpretation of the regulation or statute in question is patently inconsistent with the later one."); *see also Board of Trustees of Knox Cty. Hosp. v. Shalala,* 135 F.3d 493, 502 (7th Cir. 1998). As we noted, the regulatory history of pre-clarification Regulation CC does not clearly indicate that the midnight extension was unavailable in the check-kiting scenario. The Board's statement in the Commentary to the 1997 amendment that the modifications "do not represent any major policy changes and are intended to clarify the regulation" is accurate, because the new wording is not "patently inconsistent" with the Board's earlier interpretation. *See* 62 *Fed.Reg.* at 13801.

NBD also argues that the "Clarifying Amendment" must be legislative because it changed the actual wording of the old Regulation CC by deleting the words "in an effort to expedite delivery." However, we have previously held that when an agency changes a regulation's language it does not necessarily follow that the change is legislative. In *Homemakers* we noted that "[n]ew language need not imply new substance." 832 F.2d 408, 413. Where there is confusion about the meaning of a statute, *Homemakers* held that it is appropriate for the agency to delete the confusing language through a clarifying amendment. *Id.* At least some confusion attended the meaning of the pre-clarified Regulation CC. Various commentators agreed with NBD's interpretation, and pointed to the now-deleted language to bolster their position. Thus, the Board undertook to remove these words, but in doing so did not change the Regulation's meaning. As we held in *Pope,* "[d]espite the differing language in the two regulations, the agency had only one position." 998 F.2d 473, 483 (7th Cir.1993) (citation omitted).

█ Finally, NBD argues that if the Board only wanted to clarify Regulation CC's meaning, it could have changed or added to the regulation's Official Staff Commentary ("the Commentary"), rather than going through a full notice-and-comment procedure to change the rule's language. NBD points to other examples, in particular Federal Reserve Board Regulation Z, where the Board modified the Commentary to avoid confusion, rather than changing the regulation's text. NBD also makes much of· the formal rule-making procedures the Board used. However, we will not second guess the method the Board chose to eliminate possible confusion. Deleting words was a ·definitive way to accomplish that goal, and once a regulation is adopted by notice-and-comment rulemaking (as the original Regulation CC was), its text may only be changed in the same manner. *Homemakers,* 832 F.2d at 413. This sort of "tidying-up [is] to be encouraged rather than penalized," *id.,* and we will not use the Board's choice as evidence that its changes to Regulation CC were legislative.

█ Based on our analysis, even if the original Regulation CC did not allow Stan-

dard Bank to return the checks, we find that the 1997 Clarifying Amendment retroactively permitted the extension of the midnight deadline. Thus, the district court's finding that NBD should have honored the checks Standard delivered in the amount of $3,785,441.35 was correct.

## II.

Standard Bank cross-appeals the district court's award of pre-judgment interest at a rate of 4.9241%. This was the average three-month Treasury Bill rate, compounded quarterly from November 23, 1993 (the date NBD commenced litigation) to the date of judgment. We review the district court's decision as to the rate of prejudgment interest under the abuse of discretion standard. *P.A. Bergner & Co. v. Bank One, Milwaukee, N.A.*, 140 F.3d 1111, 1123 (7th Cir.1998).

Our practice has been to use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in "refined rate-setting" directed at determining a more accurate market rate for interest. *Cement Division, National Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir.1998); *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1332 (7th Cir.1992). We hold today that to set aside this practice and award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation.

As the transcript of the proceedings below makes clear, the district court did not base its award of the compounded Treasury Bill rate on "refined rate-setting." Instead, it opted for the lower T–Bill rate because this was a "close case," and because "it [was] perfectly clear that NBD acted throughout in good faith. There was a good faith disagreement between the parties as to the proper interpretation of the governing regulations ... and [the district court] need[s] to be fairly careful that [it] does not in any way penalize NBD Bank." Trans. March 18, 1998 hearing.

However, the "closeness" of a case is not material to the issue of prejudgment interest. *Partington v. Broyhill Furniture Industries*, 999 F.2d 269, 274 (7th Cir.1993) (where defendant argued that the judge "should not have awarded prejudgment interest because it was a close case," this court disagreed. The court granted prejudgment interest, noting that "because of litigation delay, [the plaintiff] lost the use of money that was rightfully his."). Injecting the issue of closeness into rate calculation belies the reality that "[m]oney has a time value, and prejudgment interest is ... necessary ... to compensate a plaintiff fully for a loss suffered." *Id.*

NBD relies on language in *Gorenstein Enterprises v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir.1989), stating that prejudgment interest is particularly appropriate "in a case such as this where the violation was intentional, and indeed outrageous," for the proposition that "closeness" is an appropriate consideration for the district court. However, we conclude that paragraph was only meant to underscore the deviousness of the wrongdoer in that case, and does not suggest that good faith mitigates a losing party's obligation to pay the appropriate measure of prejudgment interest. Indeed, only a few sentences before the language NBD quotes, the court held "[t]he time has come, we think, to generalize and announce a rule that prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation ... is incomplete." *Id.* This broad language undercuts NBD's argument.

Additionally, this language makes it clear that prejudgment interest must make the victim whole. *See also Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1247 (7th Cir.1995). Because NBD did not honor the returned checks, Standard Bank was without the use of $3,785,441.35, capital it likely would have lent to customers at roughly the prime rate. While Standard

Bank has been without the money, NBD has been able to make loans with it, undoubtedly at a higher rate than the three month T–Bill average. In effect, NBD has been allowed to borrow funds from Standard Bank at a rate well below what Standard would have charged any other customer. The district court's measure of prejudgment interest did not appropriately take into account the burden this placed on Standard. Instead, the district court fixed the prejudgment interest rate based on an impermissible factor, saddling Standard with an unfairly expensive transaction. This method of computation was an abuse of discretion.

## Conclusion

While we AFFIRM the judgment on the pleadings in favor of Standard Bank, the district court's grant of prejudgment interest is VACATED and we REMAND with instructions to enter an award of prejudgment interest consistent with the average prime rate for the appropriate time period.[9]

---

**9.** In *Amoco Cadiz*, 954 F.2d at 1331, we held that the average prime rate for the entire time period was the appropriate measure, rather than the current prime rate.