2007 UT 40

**U.S. BANK NATIONAL ASSOCIATION, Plaintiff, Counterclaim Defendant, and Appellee,**

v.

**HMA, L.C., Robert Michael Anderson, and Robert Henry Anderson, Defendants, Counterclaimants, and Appellant.**

No. 20050236.

Supreme Court of Utah.

May 18, 2007.

Rehearing Denied Aug. 2, 2007.

Stephen C. Tingey, Brent D. Wride, Cameron M. Hancock, Salt Lake City, for plaintiff.

Ronald W. Ady, Salt Lake City, for defendants.

NEHRING, Justice:

¶ 1 HMA, the appellant before us, is a business engaged in real estate development. HMA deposited a large check in its account with U.S. Bank. HMA then wrote a check on its U.S. Bank account to pay obligations HMA owed Barnes Bank. U.S. Bank paid the check that HMA wrote to Barnes Bank.

¶ 2 In the meantime, the maker of the check that HMA deposited, a check we will call the Woodson check in honor of its maker, stopped payment on it. When the Woodson check was returned to U.S. Bank, that bank swept remaining funds from HMA's account at the bank. U.S. Bank sued HMA in Salt Lake County for the difference between the amount the bank paid on the Barnes Bank check and the funds seized from HMA's account. U.S. Bank's efforts to recover the overdraft sum included actions to foreclose deeds of trust that secured promissory notes made by HMA.

¶ 3 HMA interposed a wide array of theories in its defense to U.S. Bank's claims, but to no avail. The district court ruled summarily for U.S. Bank. Only two of HMA's theories concern us in this appeal: (1) HMA's contention that U.S. Bank was prohibited from charging-back the Woodson check and placing the HMA account in an overdraft condition because the Woodson check's paying bank, Wells Fargo, failed to timely return it to U.S. Bank; and (2) HMA's assertion that the district court erred when it refused to change venue of the action from Salt Lake County to Utah County. We affirm.

## BACKGROUND

¶ 4 When a check is presented to a bank for collection and the account upon which the check is drawn contains insufficient funds to cover it, the paying bank may return the check to the depositary bank without risk of incurring liability for that check if it satisfies three conditions imposed by the Uniform Commercial Code (or the U.C.C.) and federal regulations. First, the check must depart the paying bank on its return trip to the depositary bank before the "midnight deadline." Next, the paying bank must plan the check's itinerary to assure its "expeditious return" to the depositary bank. *See* 1 Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 6.02[1][b], at 6–16 to 6–17 (rev. ed.2006). Finally, the paying bank must, in addition to returning the check in a timely manner to the depositary bank, provide timely notice of its intention to dishonor the check. The dispute in this appeal concerns only whether Wells Fargo met the midnight deadline and whether its return of the Woodson check was expeditious.

¶ 5 Our analysis of the timeliness of the Woodson check's return requires us to delve into the often murky contents of three sources of controlling authority: federal regulations, the Uniform Commercial Code, and the rules governing the operation of the Boise Clearinghouse, which served as a central location where member banks, including Wells Fargo and U.S. Bank, could settle the aggregation of checks written by their customers. Each of these sources has something to say on the subjects of the midnight deadline and the expeditious return. As our discussion will reveal, sorting out which voice to heed poses challenges that often appear to be best overcome by recourse to an analytical tool akin to a game of rock, paper, scissors.

¶ 6 Before we commence our analysis, we pause to take note of a peculiar feature of this appeal. Wells Fargo, the bank upon which the Woodson check was drawn, is the bank whose conduct we are called upon to scrutinize for compliance with the midnight deadline and for its obligation to make expeditious return of the Woodson check. Despite being the focus of our attention, Wells Fargo is not a party to this appeal, nor was it a party at any stage of the proceedings below. HMA's objective is not to seek any direct relief from Wells Fargo for its alleged untimely return of the Woodson check. Instead, HMA desires to exploit the legal consequences that would befall Wells Fargo for its untimeliness, most significantly its obligation to pay U.S. Bank for the Woodson check and defeat U.S. Bank's contentions that it was entitled to declare HMA's account overdrawn, to sweep funds that HMA held in deposit with the bank, to declare HMA's secured notes in default, and to recover a money judgment for any deficiency. We are unaware of any reported case similarly postured. HMA's defense to U.S. Bank's actions is based on the contention that under the U.C.C., Wells Fargo's untimely return of the Woodson check resulted in final payment of the check, *see* Utah Code Ann. § 70A–4–215(1) (2001), and that final payment or settlement of the Woodson check by operation of law terminated U.S. Bank's rights to recoup its loss from its customer, HMA, *see id.* § 70A–4–214(1). Although both parties appear to concede that this relief would be available to HMA were we to conclude that Wells Fargo returned the Woodson check late, we have not been asked to review the legal effect of untimely return in this appeal.

## ANALYSIS

¶ 7 HMA deposited the $700,000 Woodson check with U.S. Bank on Thursday, August 2, 2001. That same day, HMA wrote a check payable to the Barnes Bank in the amount of $662,147.75. Had the Woodson check cleared without mishap, when U.S. Bank paid the Barnes Bank check, all would have been well. Things went awry when the maker of the Woodson check stopped payment on it, one of three critical events in this saga, which all occurred on August 2.

¶ 8 To properly analyze the legal consequences of the treatment of the Woodson check, we must closely track the check's whereabouts as it made its way along the check processing itinerary. The Woodson check was drawn on Wells Fargo Bank. On August 2, the day on which HMA deposited the Woodson check into its U.S. Bank account, U.S. Bank sent the check to a Wells Fargo check processing center. Wells Fargo processed the check in the late hours of August 2, and the Woodson check therefore became part of the August 3 banking day. HMA contends that it contested the date that the Woodson check left U.S. Bank for presentment to Wells Fargo in opposing U.S. Bank's motion for summary judgment. HMA points to the affidavits of Maureen LaTendresse, the witness U.S. Bank produced to give deposition testimony pursuant to HMA's request under Utah Rule of Civil Procedure 30(b)(6), and challenges as lacking foundation Ms. LaTendresse's testimony that Wells Fargo received the Woodson check as part of the bank's August 3 banking day. Even if HMA were capable of neutralizing Ms. LaTendresse's statements on this question, the result would not affect HMA's concessions in its papers and at oral argument before the district court that Wells Fargo received the Woodson check as part of the August 3 banking day. Although, as we will come to understand, the date on which Wells Fargo received the Woodson check has considerable legal importance and is therefore

material, the district court did not err by treating this fact as uncontested when it ruled on U.S. Bank's motion for summary judgment.

¶ 9 On the Friday, August 3 banking day, a number of significant events occurred relating to both the Barnes Bank and Woodson checks. First, Wells Fargo processed the Woodson check, which joined the ranks of other checks that were settled through the interbank procedures of the Boise Clearinghouse. The second significant event of August 3 was U.S. Bank's decision to make available to HMA the funds represented by the Woodson check. U.S. Bank paid the Barnes Bank check without having assurance that the Woodson check would be honored. By doing so, U.S. Bank in essence granted an extension of credit to HMA pending final determination of the fate of the Woodson check.

¶ 10 After the Woodson check was settled through the Boise Clearinghouse and found its way into the hands of Wells Fargo, it began a return trip to U.S. Bank by another route, the Federal Reserve System. This journey was made necessary because Mr. Brent Woodson, the maker of the Woodson check, advised Wells Fargo on the morning of August 2 to stop payment on the check. Just as HMA's deposit of the Woodson check with U.S. Bank placed that check on a trajectory toward Wells Fargo, Mr. Woodson's stop-payment instruction put in motion a series of events that intercepted the Woodson check and sent it on a return journey to U.S. Bank.

¶ 11 Information of Mr. Woodson's intention to stop payment traveled on two parallel tracks. The first channel of check status information passed from Wells Fargo to U.S. Bank through a central hub, Primary Payment Systems (PPS). PPS gathers information about a given day's transactions in each of its participating banks' accounts at the close of each banking day. Much of this information is transmitted electronically using magnetic ink character recognition technology that draws data from the numbers coded on the bottom of checks. As of 2001, PPS had gathered and sorted account information for approximately 184 million ac-counts. The role of this conduit of information about the status of checks is largely to facilitate compliance with the third condition for return check compliance noted above: the paying bank's prompt notice of dishonor to the depositary bank.

¶ 12 Early in the morning of August 3, PPS connected the information it had received from U.S. Bank disclosing the paying bank (Wells Fargo), the account (Mr. Woodson), and the amount of the check, with the information about Mr. Woodson's stop-payment order sent to PPS by Wells Fargo. PPS then electronically transmitted the stop-payment status of Mr. Woodson's check to U.S. Bank's operations center in Minnesota. The operations center transmitted this information to the branch of U.S. Bank in Provo, Utah, where HMA deposited the Woodson check before it opened for business on August 3. While the Provo branch of U.S. Bank may have had institutional knowledge of the stop-payment status of the Woodson check, that knowledge had no legal effect on the issue before us: whether Wells Fargo returned the dishonored Woodson check to U.S. Bank in a timely manner. We turn now to our discussion of the two relevant measures of timeliness, the midnight deadline and the expeditious return.

## I. WELLS FARGO WAS ELIGIBLE FOR AN EXTENSION OF THE MIDNIGHT DEADLINE AND DISPATCHED THE WOODSON CHECK WITHIN THE TIME AUTHORIZED BY THE EXTENSION

¶ 13 A bank that seeks to return a check because of insufficient funds, a stop-payment order, and the like must normally dispatch the check before the midnight deadline. *See* Utah Code Ann. § 70A-4-301(1) (2001). The midnight deadline is defined by the U.C.C. as midnight on a bank's "next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." *Id.* § 70A-4-104(1)(j).

■ ¶ 14 Wells Fargo received the Woodson check. as part of its Friday, August 3 banking day. This meant that the midnight

deadline would occur at midnight on the bank's next banking day, Monday, August 6. HMA contends that because Idaho law designates Saturday as a banking day, the midnight deadline was not Monday, but Saturday. Under both the Boise Clearinghouse rules and Utah law, Saturday is not a banking day. In our view, either of these sources of authority for establishing banking days is superior to applying Idaho law. HMA contends that because the Woodson check was not returned through the Boise Clearinghouse, its rules do not apply to any matter relating to the return of the Woodson check. We disagree. As the example of the conflicting treatment of Saturday's status as a banking day by Idaho and Utah amply illustrates, the laws of the various states in which the members of the Boise Clearinghouse do business may vary in their designation of banking days. The clearinghouse rule achieves the useful objective of bringing uniformity to the calendar of banking days among its member banks.

¶ 15 The parties agree that the Boise Clearinghouse banking day rule applied when the Woodson check was presented. HMA contends, however, that when Wells Fargo elected to return the Woodson check through the Federal Reserve System, the bank severed itself from the application of all Boise Clearinghouse rules. Unlike HMA, we believe that the Boise Clearinghouse's effort to provide uniformity in the designation of banking days is entitled to be afforded an enduring quality that extends to post-presentment events. It is apparent to us that this result was consistent with the reasonable expectation of the member banks. A comprehensive application of the Boise Clearinghouse banking day rule also permits member banks to avoid the need to undertake a choice of law analysis before engaging in transactions involving member banks. Moreover, we see no opportunity for paying banks to manipulate the Boise Clearinghouse banking day designation in a manner that would permit them to unilaterally impose unnecessary delays when returning checks outside the clearinghouse. Such manipulation might occur if the Boise Clearinghouse rule removed days from its banking day calendar that were otherwise uniformly recognized as banking days under the laws of its member banks. This is not the case here.

■ ¶ 16 HMA contends that the affidavit and deposition testimony of Ms. LaTendresse support a finding that Wells Fargo did not meet the midnight deadline on August 6 and in fact dispatched the Woodson check on Tuesday, August 7. Were we to conclude that her testimony could reasonably be read to support this assertion, the question of whether Wells Fargo met the August 6 midnight deadline would be at issue and summary judgment would be placed out of the reach of U.S. Bank. We decline to reverse the district court on this issue, however, not because we interpret Ms. LaTendresse's affidavit differently than HMA, but rather because we conclude that as a matter of law Wells Fargo's midnight deadline was extended beyond midnight of August 6 to a time that would include the alternative dispatch times that may be extracted from Ms. LaTendresse's affidavit according to HMA. Our analysis therefore renders competing readings of Ms. LaTendresse's testimony immaterial.

¶ 17 If the U.C.C. were the exclusive authority governing the return of checks, as it largely was before Congress enacted the Expedited Funds Availability Act (the Act) in 1987, *see Farm Credit Serv. of Am. v. Am. State Bank*, 339 F.3d 764, 768 (8th Cir.2003), the obligations of a paying bank, like Wells Fargo, would begin and end with meeting the midnight deadline. Banks could focus their attention on the sole mission of getting checks out the door. What happened to the checks after dispatch was of little concern. The U.C.C. check return scheme was unpopular with bank customers. Because banks were not accountable for delays in returning checks to depositary banks, customers who had deposited checks were frequently denied access to funds for lengthy periods of time. *See generally* 1 Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 7.02, at 7–2 (rev. ed.2003). Customer unhappiness over these delays provided the primary impetus for congressional action. The Act empowered the Federal Board of Governors of the Federal Reserve System to promulgate regulations to implement the Act. The Federal Board exer-

cised this grant of authority, mindful of its need to strike a balance between the interests of bank customers to enjoy speedier access to funds and the interests of banks in managing the risks they would assume by standing behind checks of dubious pedigree deposited by their customers. *See* 12 U.S.C. § 4008(b) (1987); *see also Farm Credit Serv. of Am.*, 339 F.3d at 768.

¶ 18 The product of the Federal Board's efforts was regulation CC and, in particular, its subpart C at 12 C.F.R. sections 229.30 to 229.43 (2001). Along with its predecessor, regulation J, regulation CC created a federal check management protocol that loosened to some degree the constraints of the U.C.C. midnight deadline, but added the obligations of expeditious return and prompt notice of dishonor to banks returning checks. The effect of regulation CC was to expand the check return mission of banks beyond their U.C.C. task of monitoring dispatch before the midnight deadline to include an interest in when dishonored checks were delivered to depository banks. 12 C.F.R. §§ 229.30–.31 (2001). Although it left the midnight deadline in place, regulation CC made its effect less Cinderella-like by authorizing an extension of the deadline to paying banks that met certain conditions.

¶ 19 Regulation CC at 12 C.F.R. section 229 extends the midnight deadline in two ways. First, a paying bank (of course, as Judge Posner has noted, a bank handling a dishonored check is more accurately viewed as the nonpaying bank), *see Oak Brook Bank v. N. Trust Co.*, 256 F.3d 638 (7th Cir.2001), may escape the midnight deadline by seeing to it that it dispatches the check in time to ordinarily reach the receiving bank, here the Federal Reserve Bank, on or before the bank's next banking day after the imposed midnight deadline, provided the bank uses any means of delivery that would ordinarily accomplish the safe arrival of the check at a returning or depository bank on that day. 12 C.F.R. § 229.30(c) (2001). As an even more generous alternative, regulation CC extends the midnight deadline beyond the next banking day to a paying bank using a "highly expeditious" means of transporting the check to the receiving bank.[1] *Id.* One commentator has plausibly suggested that the Federal Board's decision to provide for an extension of the midnight deadline was prompted by the Board's desire to encourage banks to abandon the practice of using the mail to convey returned items in favor of couriers and other means of more expeditious transport. 1 Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 8.01[4], at 8–6 (rev. ed.2006). Irrespective of its possible objectives, the extension to the midnight deadline authorized by section 229.30(c) clearly replaces the midnight deadline's compliance, measured based on time of dispatch, with compliance measured by delivery. As our upcoming discussion will reveal, the delivery contemplated in section 229.30(c) is not necessarily limited, as HMA asserts, to the depository bank, but includes delivery to Federal Reserve Banks in the manner Wells Fargo employed.

## II. WELLS FARGO'S DUTY OF EXPEDITIOUS RETURN WAS SATISFIED WHEN IT PLACED THE WOODSON CHECK IN THE HANDS OF THE FEDERAL RESERVE BANK IN SALT LAKE CITY

■ ¶ 20 Wells Fargo placed the Woodson check in the hands of a courier who trans-

---

1. Regulation CC at 12 C.F.R. section 229.30(c) (2001) states:

   Extension of deadline. The deadline for return or notice of nonpayment under the U.C.C. or Regulation J (12 CFR part 210), or Sec. 229.36(f)(2) is extended to the time of dispatch of such return or notice of nonpayment where a paying bank uses a means of delivery that would ordinarily result in receipt by the bank to which it is sent—

   (1) On or before the receiving bank's next banking day following the otherwise applicable deadline, for all deadlines other than those described in paragraph (c)(2) of this section; this deadline is extended further if a paying bank uses a highly expeditious means of transportation, even if this means of transportation would ordinarily result in delivery after the receiving bank's next banking day; or

   (2) Prior to the cut-off hour for the next processing cycle (if sent to a returning bank), or on the next banking day (if sent to the depository bank), for a deadline falling on a Saturday that is a banking day (as defined in the applicable U.C.C.) for the paying bank.

ported it from the Wells Fargo central operations building located near Salt Lake International Airport to the Federal Reserve Bank in Salt Lake City sometime either before or shortly after midnight on August 6. No one disputes that Wells Fargo's choice of transport, a courier, was a highly expeditious means of delivery that would ordinarily result in delivery of the Woodson check to the Federal Reserve Bank in Salt Lake City on August 7.

¶ 21 From the standpoint of HMA, the delivery of the Woodson check to the Salt Lake Reserve Bank was irrelevant because under HMA's interpretation of the applicable authority the only delivery destination that mattered was U.S. Bank. That delivery occurred on Wednesday, August 8, a date too late even if Wells Fargo were to enjoy the benefit of the section 229.30(c) exception. To succeed, HMA's argument depends on designating the Boise Clearinghouse rules as the authority governing the manner in which Wells Fargo could return checks. Those rules, HMA asserts, required Wells Fargo to return the Woodson check directly to U.S. Bank without interrupting the journey with stops at intermediary banks including the Federal Reserve Bank.

¶ 22 Any restriction imposed on the method of returning dishonored checks by the Boise Clearinghouse rules must contend with and account for 12 C.F.R. section 210.12(a)(2) (regulation J), which states:

> A paying bank that receives a check as defined in Sec. 229.2(k) of this chapter (Regulation CC), other than from a Reserve Bank, and that determines not to pay the check, may send the returned check to any Reserve Bank (unless its Administrative Reserve Bank directs it to send the returned check to a specific Reserve Bank) in accordance with subpart C of part 229 of this chapter (Regulation CC), the Uniform Commercial Code, and the Reserve Banks' operating circulars.

The Boise Clearinghouse rules surrender any claim as controlling authority; however, on the method of check return when this seemingly unambiguous grant of permission to return checks through the Federal Reserve System—checks like the Woodson check that were not presented for collection through the Federal Reserve System—is coupled with the assertion of the primacy of federal regulations over inconsistent provisions of the Uniform Commercial Code, any other state law, or regulation CC found in 12 C.F.R. section 210.3(f) of regulation J. The official commentary to regulation CC reinforces this point by explaining that section 229.30 supersedes provisions of the U.C.C. relating to the method of returning dishonored checks "in that instead of returning a check through a clearinghouse or to the presenting bank, a paying bank may send a returned check to the depositary bank or to a returning bank." 12 C.F.R. pt. 229, app. E, § 229.30(a), cmt. 10.a (2001).

¶ 23 Federal regulations not only authorize check return through the Federal Reserve System even where clearinghouse rules might be construed to prohibit it, but they also make clear that the successful transfer of a returned check to a Federal Reserve Bank satisfies the paying bank's duty of expeditious return. The commentary to regulation CC notes that "[a]ll Federal Reserve Banks agree to handle returned checks expeditiously." *Id.* at cmt. 5.b.i (2001).

¶ 24 HMA resists this conclusion by going to considerable lengths to show that the Woodson check was not delivered within the time limits established by either the two-day/four-day test or the forward collection test, the two standards by which regulation CC measures expeditious return. HMA's labors in this cause were to no avail because whether the Woodson check met either test is irrelevant. Liability for untimely return attaches to a bank upon its failure to make expeditious return of a dishonored check. By agreeing to handle returned checks in an expeditious manner, Federal Reserve Banks impliedly acknowledge that their handling of the check will conform to the two-day/four-day and forward collection tests.

¶ 25 None of the authorities cited by HMA in support of its conclusion that Wells Fargo was obliged to deliver the Woodson check directly to U.S. Bank and not to use the Federal Reserve System alters our conclusion that Wells Fargo satisfied its duty of expeditious return when it delivered the

check to the Federal Reserve Bank in Salt Lake City.

¶ 26 HMA's selection of *First National Bank of Chicago v. Standard Bank & Trust,* 172 F.3d 472 (7th Cir.1999), as authority for the proposition that a paying bank can escape liability for untimely return if it misses the midnight deadline only by placing a dishonored check in the hands of the depositary bank before the close of the next banking day adds nothing to its argument. It is no surprise that *First National Bank* focused on the timeliness of the paying bank's return of checks to the depositary bank because the itinerary of the checks included no stop at an intermediary receiving bank. We have little doubt that had an intermediary receiving bank been used along the return route, the *First National Bank* court would have concluded that the section 229.30(c) exception would have applied inasmuch as the court noted that regulation CC "removes the constraint of the midnight deadline if the check reaches either the depositary bank or the returning bank to which it is sent on the banking day following the expiration of the midnight deadline or other applicable time for return." *Id.* at 477.

¶ 27 HMA also points to a hypothetical scenario appearing in the Clark treatise to bolster its claim that expeditious return under regulation CC and access to the midnight deadline extension provided by the regulation requires direct and timely return to the presenting bank. In the hypothetical, the Federal Reserve Bank was the presenting bank. The hypothetical focuses on the paying bank's obligation to make timely return of a dishonored check to the Federal Reserve Bank in its status as the presenting bank. Whether the Federal Reserve Bank also served as the presenting bank is not the issue upon which the outcome of the Clark hypothetical turns. Rather, the hypothetical focuses on time and method of check transport. We would expect any hypothetical scenario that had as its central focus the question of check routing to include at least some mention of the provision in regulation J that expressly authorizes return through the Federal Reserve System and the agreement by the Federal Reserve System to handle those returns expeditiously.

¶ 28 We accordingly hold that the district court properly granted U.S. Bank summary judgment on the issue of the timeliness of the Woodson check's return.

## III. THE DISTRICT COURT DID NOT ERR WHEN IT DENIED HMA'S MOTION FOR CHANGE OF VENUE

¶ 29 HMA contends that the district court erred in denying its motion for change of venue to the Fourth District, which includes Provo. In HMA's view, venue would have been more appropriate there considering the company's head office is located in Provo and its U.S. Bank account, which was the origin of the activities underlying this case, is also located in Provo.

¶ 30 Absent a clear abuse of discretion, we will not disturb a trial court's ruling on a motion to change venue. We will reverse such a decision only if it "exceeds the bounds of reasonability." *See Durham v. Duchesne County,* 893 P.2d 581, 582 (Utah 1995); *Crossland Sav. v. Hatch,* 877 P.2d 1241, 1243 (Utah 1994). We see no such abuse of discretion in this instance and consequently decline to reverse the trial court's decision.

¶ 31 HMA agreed in several signed commercial guarantees to U.S. Bank, which are a part of this action, that Salt Lake County would serve as the proper venue for any action arising out of those guarantees. Additionally, Utah Code section 78–13–1 (2001) provides that actions for foreclosure or liens and mortgages on real property "must be tried in the county in which the subject of the action or some part thereof, is situated." U.S. Bank seeks in this action foreclosure of real property owned by HMA and located in Salt Lake County.

¶ 32 Accordingly, we hold that the district court acted within its discretion in denying HMA's motion for change of venue and that Salt Lake County was the appropriate venue to determine this case.

## CONCLUSION

¶ 33 U.S. Bank was justified in charging-back the Woodson check and placing the HMA account in an overdraft condition because Wells Fargo timely returned the check to U.S. Bank. The district court properly refused change of venue of the action from Salt Lake County to Utah County. Affirmed.

¶ 34 Chief Justice DURHAM, Justice DURRANT, Justice PARRISH, and Judge PULLAN concur in Justice NEHRING's opinion.

¶ 35 Having disqualified himself, Associate Chief Justice WILKINS does not participate herein; District Judge DEREK PULLAN sat.